**Ex parte Carl E. HOSKEN.**

**No. 7353.**

Court of Civil Appeals of Texas, Beaumont.

April 13, 1972.

Evans & Marshall, San Antonio, for relator.

Walter Umphrey, Port Arthur, for respondent.

KEITH, Justice.

In this original habeas corpus proceeding the only serious question presented is whether or not Relator was deprived of due process of law in the hearing which resulted in his imprisonment. Our review of the proceedings is necessarily limited since we do not exercise appellate, but original jurisdiction. We wrote upon the subject recently in Ex parte Williams, 469 S.W.2d 449, 450 (Tex.Civ.App., Beaumont, 1971, original proceedings), and repeat only a few of the comments made at that time.

For this contempt proceeding to be subject to collateral attack in this habeas corpus proceeding, it must be void and not merely voidable. Ex parte Tyler, 152 Tex. 602, 261 S.W.2d 833, 834 (1953). We do not review the exercise of discretion by the trial judge nor the sufficiency of the evidence to support his action. Ex parte LaRocca, 154 Tex. 618, 282 S.W.2d 700, 703 (1955). Relator is entitled to his discharge in such a case when he is deprived of his liberty without due process of law. Ex parte Peterson, 444 S.W.2d 286, 289 (Tex.Sup.1969).

Relator's former wife procured the entry of a divorce decree in one of the District Courts of Bexar County and the court awarded her the custody of the two minor children born of the marriage. The original decree did not provide for visitation rights for the father, our Relator. Thereafter, Relator invoked the jurisdiction of the Court of Domestic Relations of Jefferson County seeking the entry of an order which would "specifically set reasonable visitation rights" with the children who were then in Jefferson County. After a hearing, the court entered an order on August 9, 1971, permitting Relator to have the children with him from 4:00 p. m. on Friday until 7:00 p. m. upon the following Sunday one weekend during each calendar month beginning August 13, 1971. Under the order, it was his duty to return the children to their mother in Jefferson County and a bond was required of him to guarantee his performance of that obligation.

It is clear from our record that Relator procured the children on the Labor Day weekend (on or about September 6, 1971) and did not return the children to their mother at the time and place required by the order. The mother regained custody of her children several months later after the children had been located in Tampa, Florida, and Relator had been indicted by the Grand Jury of Jefferson County for kidnapping. Subsequently, her counsel filed a verified application seeking to hold Relator in contempt for his violation of the court's order of August 9, 1971. At that time the mother had custody of the children and Relator was not *then* in default of any provision of the August order.

Relator was served with notice of the contempt hearing and on February 16, 1972, the date thereof, appeared and advised the court that his regularly retained counsel had been put to trial before a jury in San Antonio on the preceding day and requested a postponement of the hearing until his retained counsel could be present. No formal motion for continuance was filed and Relator's informal request was denied.

From Relator's affidavit which appears in our record (and which has not been impugned in any manner), it appears that when the case was called for hearing, he approached the bench and advised the court that his counsel was engaged in trial in San Antonio and that he "would like to have the case held up" until counsel could be present. Relator continues:

"The Judge told me no that he was going to go ahead and have a hearing and then I asked him for a Court Appointed Attorney and the Judge told me that I was not entitled to a Court Appointed Attor-

ney in a civil proceeding and then I was told to sit down and the hearing started."

The former wife then testified at length and her testimony, if accepted by the trier of the facts, would have been sufficient to support the judgment of contempt. Upon completion of her direct examination, her counsel announced: "That's all I have, Your Honor." Thereupon, the following proceedings, as reflected by the statement of facts, transpired:

"THE COURT: (Directed to Mr. Hosken) Would you like to ask any questions?

"MR. HOSKEN: Your Honor, this is a little bit unfair. I believe I would like to maybe take a few minutes to hire an attorney. I was told what to ask for when I came down if a continuance would not granted. This jury trial was held over—

"THE COURT: You can go out and talk to some attorneys."

Relator explains what happened in this manner:

"[W]hen the Judge asked me if I wanted to ask my ex-wife any questions I told him that I felt that things were unfair and that I would like to have a few minutes to hire an attorney and was given permission to try to hire one. I went out into the hall way and I saw a man there and I asked him if he was a lawyer and he said he was, . . . [He] said he would represent me but that he was tied up on another matter and that he could not come into that Courtroom for about 30 minutes. So we agreed that he would represent me. . . . I then stepped into the phone booth and put in

a telephone call to Mr. Evans in San Antonio to tell him that the case was going to be heard and that I had engaged Mr. Charles D. Carver to represent me and while I was talking to Mr. Evans on the telephone the bailiff came and took me out of the phone booth and brought me back into the Courtroom. The Judge then asked me if I had an attorney and I told him that I did not have one right then and I was going to tell him that Mr. Carver was going to represent me and would be available in about 30 minutes but I was not given an opportunity to tell the Judge that and I was told to sit down and the hearing went on . . . . ." [1]

The statement of facts continues:

"(At which time the court took a recess and the proceedings continued as follows: Reporter's notation: There was some discussion between Mr. Hosken and the Court before the court reporter was in the courtroom.)

"THE COURT: Is he [retained counsel] in trial?

"MR. HOSKEN: Yes, sir, in Judge Onion's court. See this was held over, Your Honor, it was not expected to.

"THE COURT: A man usually gets ten days and you have a month on these things.

"MR. HOSKEN: I got it on [January] the 27th on a Bill of Review in San Antonio.

"THE COURT: I am going to hear some more evidence.

"MR. UMPHREY: We call Mr. Hosken under the adverse party rule.

---

1. The affidavit of Relator's retained counsel corroborates the fact that Relator did have such a conversation with him and that it was abruptly terminated when Relator "hung up the phone and I did not find out what had happened until later on."

"(WHEREUPON, CARL E. HOSKEN, after having been duly sworn upon his oath, testified as follows, to-wit:)

## "CROSS EXAMINATION [2]

## "BY MR. UMPHREY:"

Although Relator did not, under these circumstances, decline to testify, he did invoke his privilege against self-incrimination upon several occasions during his "cross-examination" by the wife's counsel.[3] At the conclusion of the hearing, the court found Relator guilty of contempt of court for the violation of the order of August 9 and set his punishment at confinement in the county jail for twenty days. Art. 1911 a, § 2(a), Vernon's Ann.Civ.St., as amended.

Relator having been imprisoned under the terms of this order, we granted his application for the writ of habeas corpus and ordered his release upon bond pending hearing of the application for the writ. Art. 1824a, V.A.C.S. Our record consists of a transcript and statement of facts from the Court of Domestic Relations of Jefferson County, a record of another related proceeding in Bexar County, and affidavits by Relator and his retained counsel.[4] Although duly notified of the hearing, counsel who represented the former wife in the contempt proceeding has made no appearance, nor has he filed a brief. Several questions are presented in the brief filed on behalf of Relator but only the procedural due process question is worthy of discussion.

■ Before entering into our discussion of the problem presented in this case, we first review some of the underlying principles. The distinction between direct and indirect (or constructive) contempt is clearly set out in Ex parte Ratliff, 117 Tex. 325, 3 S.W.2d 406 (1928). The test is whether the contempt is within or outside the presence of the court. See also Shillitani v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); 17 Am.Jur.2d, Contempt, § 6, p. 11; 17 C.J.S. Contempt §§ 3–4, pp. 8, 9; and, 25 Sw.L.J. 805, 806 (1971). In the case under consideration the contempt was indirect or constructive.

The line of demarcation between civil contempt and criminal contempt is not so clear. The textwriter in 17 C.J.S., Contempt, § 5(2), p. 12, says that the line is "not always clear" and is "in hopeless confusion." Nevertheless, we are told that "[i]t is the nature of the relief asked that is determinative of the nature of the proceeding." Penfield Co. v. Securities & Exch. Com., 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117 (1947); Shillitani v. United States, supra (384 U.S. at p. 368, 86 S.Ct. 1531). See also, Gompers v. Buck's Stove & R. Co., 221 U.S. 418, 449, 31 S.Ct. 492, 55 L.Ed. 797 (1911). *Shillitani,* supra, follows the rationale of *Gompers.*

The textwriter in 17 Am.Jur.2d, Contempt, § 4, p. 7, states the rule in this manner:

"Where the primary purpose is to preserve the court's authority and to punish for disobedience of its orders, the contempt is criminal. Where the primary purpose is to provide a remedy for an injured suitor and to coerce compliance with an order, the contempt is civil."

---

2. We are not called upon to express any opinion upon whether Relator's constitutional rights were violated by being called to the stand in this type proceeding.

3. Relator, being a layman without the benefit of counsel in the proceeding, may very well be held to have waived his right to invoke his constitutional privilege against self-incrimination by his failure to invoke the same promptly or in proper form. Cf. *Annotation, "Self-Crimination—Waiver—Civil Cases,"* 72 A.L.R.2d 830.

4. Our record, compiled by Relator and his counsel, is even more informal than that considered by the court in Ex parte Cardwell, 416 S.W.2d 382, 383, fn. 1 (Tex.Sup.1967). Affidavits of counsel apparently were considered by the Supreme Court in Ex parte Herring, 438 S.W.2d 801, 803 (Tex.Sup. 1969). Since the record has not been challenged in any particular, we will assume that it forms a proper basis upon which to rest our decision.

■ Coercive imprisonment to enforce compliance with an order of the court is civil in nature. If the party charged in the proceeding had chosen to obey the order, he would not have faced jail. And, it has been said that in such instances, the defendants "carry the keys of their prison in their own pockets." In re Nevitt, 117 F. 448, 461 (CCA 8th Cir. 1902). In such an instance, ordinarily the defendant may procure his release by compliance with the provisions of the order of the court. This is the rule prevailing in Texas, having been adopted by our Supreme Court in Ex parte DeWees, 146 Tex. 564, 210 S.W. 2d 145, 147 (1948), and reaffirmed in Ex parte Ramzy, 424 S.W.2d 220, 224 (Tex. Sup.1968).

■ Where the primary purpose of the proceeding is to vindicate public authority, the proceeding is usually denominated criminal. The action is punitive in nature. Nye v. United States, 313 U.S. 33, 43, 61 S.Ct. 810, 85 L.Ed. 1172, (1941); Bloom v. Illinois, 391 U.S. 194, 201, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968). Ordinarily, the punishment is fixed and definite and no subsequent voluntary compliance on the part of the defendant can enable him to avoid punishment for his past acts.

■ In some instances, the proceeding partakes of the nature of both. Thus, when the court imposes fine or imprisonment for the violation of a child support order, it is punishing for yesterday's contemptuous conduct. This is essentially criminal contempt. When it adds the coercive sanction of imprisonment until the order is complied with, it is announcing the consequences of tomorrow's contumacious conduct. In the latter instance, the contempt is civil in nature. Ex parte Ramzy, supra (424 S.W. 2d at p. 227), concurring opinion of Justice Norvell. See also, *Penfield,* supra (330 U.S. at p. 594, 91 L.Ed. 1117).

The case under review was criminal in nature since the primary—indeed the only—purpose was to punish for the prior contemptuous conduct.

Having determined that the proceeding which we review was for constructive or indirect contempt, criminal in nature, we consider some of the Texas decisions upon the subject.

In Deramus v. Thornton, 160 Tex. 494, 333 S.W.2d 824, 829 (1960), the court said:

"Contempt proceedings are generally criminal in their nature whether they grow out of criminal or civil actions. It follows then that the proceedings should conform as nearly as practicable to those in criminal cases."

See also, Ex parte Cardwell, 416 S.W.2d 382, 384 (Tex.Sup.1967), wherein the court said "a contempt proceeding is unlike a civil suit, has some of the incidents of a trial for crime, and is quasi-criminal in nature."

Notwithstanding the fact that the sentence which we review is criminal in nature, this court has jurisdiction to pass upon the questions presented and to grant the relief sought. Art. 1824a, V.A.C.S., confers extremely limited jurisdiction upon the Courts of Civil Appeals in original habeas corpus proceedings. Nevertheless, insofar as material to this proceeding, the limited authority so granted is not unlike the broader authority conferred upon the Supreme Court by the provisions of Art. 1737, V.A.C.S. The latter article has been construed upon several occasions by our Supreme Court with the decisions finally being brought into harmony in Ex parte Morris, 162 Tex. 530, 349 S.W.2d 99, 101 (1961), where the court concluded its review by saying:

"Our original habeas corpus jurisdiction is limited thereby to cases in which a person has been confined for violating an order, judgment or decree in a civil cause, and we are without power to inquire into the legality of restraint imposed for some other reason."

Accord: Ex parte Hofmayer, 420 S.W.2d 137 (Tex.Sup.1967). Compare Ex parte McDonald, 441 S.W.2d 828 (Tex.Sup.1969)

with Ex parte McDonald, 447 S.W.2d 938 (Tex.Crim.1969).

■ Paraphrasing Justice Walker's remarks in *Morris*, supra, we hold that our jurisdiction is limited to cases in which a person has been confined for violating an "order, judgment, or decree theretofore made, rendered, or entered by such court or judge in a divorce case, wife or child support case, or child custody case." Art. 1824a, V.A.C.S. The legislature has not defined our jurisdiction in the terms of civil or criminal contempt. Ex parte Morris, supra.

Since state courts owe as much duty as federal courts to construe and protect constitutional rights, and our jurisdiction having been invoked, it becomes our duty to determine if Relator's constitutional rights were infringed upon in the contempt proceeding which resulted in his imprisonment.

In this type of proceeding we are authorized to consider the entire record "to determine whether due process has been accorded to the relator." Ex parte Cardwell, supra (416 S.W.2d at p. 384). See also, Ex parte Peterson, 444 S.W.2d 286, 289 (Tex.Sup.1969), wherein relators were discharged because "they were deprived of their liberty without due process of law" when there was no record showing service of the notice of the contempt hearing.

Relator's conviction being for constructive, not direct, contempt, the rule of law announced in Ex parte Flournoy, 158 Tex. 425, 312 S.W.2d 488, 492 (1958), is applicable. There the court said:

"Relator could not have been committed legally for violating the terms of the injunction order of March 14 without a hearing *and a reasonable opportunity to obtain counsel.*" (emphasis supplied)

The first case cited in support of this ruling was Ex parte Ratliff, supra (3 S.W. 2d 406), while the second citation was to Cooke v. United States, 267 U.S. 517, 537, 45 S.Ct. 390, 69 L.Ed. 767 (1925), and this quotation from *Cooke* is to be found in *Ratliff* (3 S.W.2d at .p. 407):

" 'Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. *We think this includes the assistance of counsel, if requested,* and the right to call witnesses to give testimony, relevant either. to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed.' " (emphasis supplied)

Assuming without deciding that the offense for which Relator was being tried was a "petty offense",[5] nevertheless, the punishment upon conviction could result in Relator being deprived of his liberty for as much as six months. At this late date, no one will dispute the fact that a person faced with deprivation of his liberty has the right to be represented by counsel. Art. 1, § 10, Constitution of the State of Texas, Vernon's Ann.St.; Sixth Amendment, United States Constitution. And, the command of the Sixth Amendment is made obligatory upon the states by the provisions of the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799, 93 A.L.R.2d 733 (1963). Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964); Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

In recent years, the Supreme Court of the United States has held many times that the due process clause of the Fourteenth

5. For a discussion of what constitutes a "petty offense", see generally: United States v. Barnett, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964); Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966); Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491, (1968). See also, James v. Headley, (5th Cir.1969), 410 F.2d 325, 331; Rodriguez v. Rosenblatt, 58 N.J. 281, 277 A.2d 216, 219 (1971).

Amendment protects the rights guaranteed under the first eight amendments to the United States Constitution. Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), contains an excellent discussion of the authorities. Upon the same date that *Duncan* was announced, the court reviewed a state court conviction of contempt, Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968). In *Dyke*, the court held that the denial of a jury trial did not present a constitutional violation under the "petty offense" doctrine of *Duncan*. However, the violation of Dyke's Fourth Amendment rights resulted in a reversal of the contempt conviction. See also, Bloom v. Illinois, supra (391 U.S. 194, 88 S.Ct. 1477), wherein the court held that prosecutions for criminal contempt are within the Sixth Amendment ambit when the penalty may be assessed at more than six months' confinement.

■ We are not considering a case wherein the defendant claims that his constitutional rights were infringed because the court did not furnish him with court-appointed counsel. Instead, Relator had counsel and desired representation before being sentenced to jail. Alternatively, he sought a short postponement in order to secure new counsel. Whether or not a defendant in the traditional misdemeanor criminal case arising from a violation of a criminal statute or ordinance is entitled to court-appointed counsel is one presently before the Supreme Court of the United States. Argersinger v. Hamlin, certiorari granted, 401 U.S. 908, 91 S.Ct. 887, 27 L.Ed. 2d 805, submitted on February 28, 1972.[6]

Therefore, we confine our decision to that which is before us, namely, the constitutional right of a litigant to be represented by counsel of his own selection before being deprived of his liberty.

In Bloom v. Illinois, supra, the court said appropos to our case: "In modern times, procedures in criminal contempt cases have come to mirror those used in ordinary criminal cases." (391 U.S. at p. 207, 88 S.Ct. at 1485)

In People v. Crovedi, 65 Cal.2d 199, 53 Cal.Rptr. 284, 290, 417 P.2d 868, 874 (1966), the court said:

"[T]hough . . . a defendant has no *absolute* right to be represented by a particular attorney, still the courts should make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney. . . . This is especially so when defendant is in no way responsible for the absence of his retained counsel." (emphasis in original)

In our case the denial of counsel was compounded by the trial court's refusal to permit sufficient time within which Relator could procure substitute counsel upon the day of the hearing. As noted earlier, a 30-minute delay would have enabled Relator to have had the assistance of his new counsel whom he had found in the hallway of the courthouse a few minutes earlier.

It is no answer to say that Relator's guilt was established by competent evidence wholly apart from his own testimony. He had a right to have his counsel present to participate in the hearing, to cross-examine prosecution witnesses (Relator did not ask any questions of his former wife), and to present his defense, if any, to the charges.[7] His counsel, of course, could have presented argument in mitigation of the penalty to be imposed. Cooke v. United States, supra (267 U.S. at p. 537, 45 S.Ct. 390).

---

6. The lower court decision in *Argersinger* is reported in 236 So.2d 442 (Fla.Sup. 1970), sub-nom State ex rel. Argersinger v. Hamlin. Solicitor General Griswold's argument in *Argersinger*, adopting the rationale of Rodriguez v. Rosenblatt, supra, lends prestige to that important decision.

See 10 Criminal Law Reporter 4201, March 8, 1972.

7. At one time during his hearing, Relator did say that "I took the children with her permission," but the issue was not pursued by any of the participants.

In considering a state court conviction for criminal contempt committed in the presence of the court, it was said in Mayberry v. Pennsylvania, 400 U.S. 455, 465, 91 S.Ct. 499, 504, 27 L.Ed.2d 532 (1971): "Whether the trial be federal or state, the concern of due process is with the fair administration of justice." The late Justice Black was even more emphatic in his dissent in Frank v. United States, 395 U.S. 147, 160, 89 S.Ct. 1503, 1511, 23 L.Ed.2d 162 (1969):

> "Those who commit offenses against courts should be no less entitled to the Bill of Rights than those who commit offenses against the public in general."

It is manifest that courts cannot in every case await the convenience of some attorney before they can function. Reduced to its lowest terms, this would allow a popular attorney to have the courts marking time for his convenience. However, the court said in Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964):

> "[I]t is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. Chandler v. Fretag, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed.
>
> 4. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."

Under our record, had Relator been afforded an additional thirty minutes, his newly retained counsel would have been present; and, we may presume competent counsel would have included in the record a verified motion for continuance. Rule 253; 3 McDonald Texas Civil Practice, § 10.32, pp. 91, 92 (1970 Rev.Vol.).

We conclude, therefore, that in preceeding to trial in the absence of Relator's counsel the judgment of conviction was a denial of due process of law; thus, Relator was deprived of his liberty under a void judgment and is entitled to his release.

We express no opinion upon the remaining points contained in Relator's brief before this court. Ex parte Holden, 144 Tex. 295, 190 S.W.2d 485 (1945).

■ The guilt or innocence of Relator is not brought into question by this habeas corpus proceeding—only the legality of his detention is relevant. Gilbert v. State, 437 S.W.2d 444, 447 (Tex.Civ.App., Houston—14th Dist., 1969, error ref. n. r. e.). Consequently, our action discharging Relator from custody under the order herein mentioned is without prejudice to the right of the court to try the issue of contempt in a proceeding conducted in accordance with law.

The Relator is discharged from custody under the order of commitment dated February 16, 1972.