**Doris ADAMS, Plaintiff,**

v.

**Grainger W. McILHANY, Individually and as Presiding Judge of the 31st Judicial District of Texas, Defendant.**

**Civ. A. No. CA–2–84–31.**

United States District Court,
N.D. Texas,
Amarillo Division.

Sept. 7, 1984.

James C. Harrington, American Civil Liberties, Foundation of Tex., Inc., Broadus Spivey, Spivey, Grigg & Kelly, Austin, Tex., Betty Wheeler, for plaintiff.

Bill W. Waters, Waters, Holt, Fields & Waters, Pampa, Tex., Roland Scott Lyford, Asst. Atty. Gen., Austin, Tex., for defendant.

## ORDER

MARY LOU ROBINSON, District Judge.

Plaintiff brings an action for damages and equitable relief claiming that her constitutional rights were denied her in violation of 42 U.S.C. § 1983 when she was jailed pursuant to a wrongful order of contempt issued by Defendant Judge McIlhany.

Defendant responds by making a Motion to Dismiss (now being treated as a Motion for Summary Judgment), claiming that Plaintiff has failed to state a claim upon which relief can be granted.

## UNDISPUTED FACTS

The following facts are undisputed:

(1) Plaintiff resides in Miami, Texas. Miami, Texas, is located in Roberts County, Texas.

(2) Defendant presides over the 31st Judicial District of Texas. The 31st Judicial District comprises Gray, Hemphill, Lipscomb, Roberts, and Wheeler Counties, Texas.

(3) Plaintiff is about 51 years old and has at least three sons including David Shannon Adams, Jack Glen Adams, and Paul Scott Weeks.

(4) During the months of May and June of 1983, the above three of Plaintiff's sons were in trouble with the law and had criminal cases pending before the Defendant.

(5) During the months of May and June of 1983, the parties exchanged the following correspondence:

1. The Plaintiff sent a letter dated May 23, 1983, to Judge McIlhany concerning the legal problems of Glen Adams and Paul Weeks.

2. The Plaintiff sent a second letter dated June 8, 1983, to Defendant concerning the general state of "the law" in Miami.

3. On or about June 10, 1983, Defendant sent the following letter to Plaintiff:

Dear Mrs. Adams;

I received your letters regarding your sons.

I regret that they have not seen fit to reform to society.

Sincerely yours,

Grainger W. McIlhany

4. Shortly after receiving the Defendant's letter, Plaintiff responded on or about June 14, 1983, by adding her own comments to the bottom and back of Defendant's letter and returning it to him. The letter reads as follows:

Judge McIlhany

I regret too inform you that my children have been Rail Road by this law in Miami. There is plenty of people in this town who knows what is really going on but who can fight City Hall. I haven't got but one thing too say. You had better open up your eyes & search your own heart and see what is really going on, in this town, The law stinks & stinks bad. My boys are boys, not men. There behavery is as a boy—they have too learn too! ! I have seen plenty of grown people act worse & that is the law down here trying to ruin 3 of my childrens

lives & they are doing a good job. Shannon did not rape Angie Bean. Eddie as far as I'm concerned planed through prints from the jail after he arrest him. He is a wicked man & so is Lando Brown. I hope all of you pay if you don't stop doing my children this way. *You will too, in God's way.* The only way you can win with the law any more is if you can buy your way out & its done every day. You know I can't pay so you stick my boys good. Harold Comer is the only one I have seen do my kids right.

Doris Adams

(6) The matters regarding Paul Scott Weeks and David Shannon Adams were still before the Defendant's Court when Plaintiff wrote her June 14, 1983, letter.

(7) All three letters to Defendant were private correspondence. None were ever filed or published.

(8) Plaintiff did not send any communications to Defendant after June 14, 1983.

(9) On October 5, 1983, Plaintiff received an order from Defendant to appear before him on October 7, 1983, (two days from the date of the order).

(10) Plaintiff had never been before Defendant in any proceeding or matter prior to October 7, 1983. [C–13]

(11) Plaintiff appeared before Defendant on October 7, 1983. Plaintiff did not have an attorney present. Plaintiff was not told that she had a right to an attorney and no inquiry was made regarding whether she could afford an attorney so that one might be appointed for her, nor was Plaintiff advised of any rights she may have had at the time of the hearing.

(12) The contempt proceeding involved the June 14, 1983, communication with Defendant, specifically, the language stating, "the only way you can win with the law any more is if you can buy your way out and its done every day. You know I can't, so you stick my boys good."

(13) On October 7, 1983, after the hearing, Defendant found Plaintiff in contempt and ordered her sentenced for a period of 30 days in jail and to pay costs of court.

(14) The Plaintiff was thereafter placed in confinement for a period of twenty-eight (28) days.

## CLASSIFICATION OF CONTEMPT

In the State of Texas, contempts of court are labeled as criminal or civil, *and* as direct or constructive. Because these labels are misapplied in some portions of the pleadings and briefs which have been submitted, some discussion on the classification of contempt may be helpful. Distinguishing criminal from civil:

*Criminal contempt*—where the primary purpose of the proceeding is to vindicate public authority (e.g., to punish acts done in disrespect of the court or its process, or which obstruct the administration of justice), the proceeding is usually denominated criminal. The action is punitive in nature. *Ex Parte Hosken*, 480 S.W.2d 18, 23 (Tex.Civ.App.—Beaumont 1972).

*Civil contempt*—defined as those instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders and decrees made for their benefit. The purpose of civil contempt is remedial and coercive in nature. 13 Tex.Jur.3rd CONTEMPT § 3.

The key to distinguishing constructive and direct contempts is whether the act was committed "in the presence of the court".

*Direct contempt*—words spoken or acts done in the presence of the court or in open court.

*Constructive contempt*—(or indirect contempts) those acts which occur outside the presence or hearing of the court.

Thus, this latter classification goes to *where* the acts took place rather than the *nature* of those acts, as in the former distinction.

■ The important classification for the case at bar is the direct vs. constructive one because the contemnor's rights are substantially different under the two. While direct contempt can be dealt with immediately without procedural safeguards

for the contemnor, constructive contempt may not be punished summarily. The contemnor has the common due process rights in the latter case.

 The alleged contempt in this cause should be classified as constructive criminal contempt because Judge McIlhany sought to punish the Plaintiff for acts outside the presence of the court. The case of *Cooke v. The United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925), provides authority for the constructive contempt classification. There the Court considered a fact situation similar to the one in the case at bar in that the contemnor in *Cooke* was accused of delivering an insulting letter to a judge while his court was in a short recess. The Court found his act to be one not in open court and that proceedings based upon such an act were subject to due process requirements. *Id.* at 394–15. The *Cooke* court went on to include within the due process rights of the constructive contemnor, the right to reasonable notice, assistance of counsel, and trial before an unbiased judge, if possible, especially where the contempt charged has an element of personal criticism or attack upon the judge. As to the latter element, the Court later stated in *Johnson v. Mississippi*, 403 U.S. 212, 91 S.Ct. 1778, 1780, 29 L.Ed.2d 423 (1971), that trial before an unbiased judge is essential to due process. *See also Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 505, 27 L.Ed.2d 532 (1971).

All three of the above elements of due process are arguably violated in the present case given the Plaintiff's allegations and notwithstanding Defendant's unsupported claim within the Statement of Facts portion to his Brief in Support of Motion to Dismiss that the Plaintiff discussed the matter with an attorney of her choosing and thereafter decided not to retain counsel.

However, that Defendant's major contention in his Motion to Dismiss is not that the alleged due process violations did not occur, but rather, that the Judge has absolute judicial immunity for his actions regardless of due process violations. This view is supported by the recent Supreme Court decision in *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), where the Court reiterated the idea that violations of due process do not defeat judicial immunity. "A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." (*Id.* at 1106). Therefore, the most important consideration to undertake at this point is the scope of the doctrine of judicial immunity.

## JUDICIAL IMMUNITY TO CLAIMS FOR DAMAGES.

The seminal case regarding the scope of judicial immunity as to a suit in damages under 42 U.S.C. § 1983 is *Stump v. Sparkman, supra*. Generally speaking, *Stump* holds that judges are immune from liability for their judicial acts so long as those acts are not done in a clear absence of jurisdiction.

### Question of Jurisdiction.

The district court of Texas is one of general jurisdiction. Tex.Rev.Stat.Ann. Art. 1909. Within that jurisdiction is the power to punish for contempt. Tex.Rev. Stat.Ann. Art. 1911a § 1.

In analyzing this jurisdiction, consideration should be given to the words of the Court in *Stump*.

The scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction. Citing *Bradley v. Fisher*, 13 Wall 335, 351 [20 L.Ed. 646] (1872).

 Giving the proper effect to the above passage leads to the conclusion that the acts of Judge McIlhany were within his jurisdiction, or at least, not in a clear absence of jurisdiction. The Defendant, by

virtue of his position as district judge, has been given by statute the contempt power to maintain the authority and dignity of the court. Although the propriety of his use of that power is subject to question, such is not sufficient to establish a clear absence of jurisdiction.

To help in understanding what might constitute a clear absence of jurisdiction, reference can be made once again to *Stump*.

> In *Bradley*, the Court illustrated the distinction between lack of jurisdiction and excess of jurisdiction with the following examples: if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune. (*Id.* at 1105, n. 7)

The present cause falls closer to the latter example than it does to the former.

*Judicial Act*

Although the concepts of "judicial acts" and "judicial jurisdiction" are somewhat intertwined, many courts have analyzed the problem with this two-step approach and ask,

> (1) whether the Judge's actions were judicial acts AND
>
> (2) whether or not they fall clearly outside his jurisdiction. *Harper v. Merckle*, 638 F.2d 848, 858 (5th Cir.1981).

We move on, therefore, to the question of "judicial act".

■ In determining whether a particular act is judicial, the Fifth Circuit has adopted the language of *Stump* indicating that two factors must be considered,

> (1) whether it is a function normally performed by a judge, and ·
>
> (2) whether (the parties) dealt with the judge in his judicial capacity. *Arsenaux v. Roberts*, 726 F.2d 1022, 1023 (5th Cir. 1982).

In applying this test to the present facts, the Plaintiff urges the Court to follow the reasoning of *Harper v. Merckle, supra.* In that case, a § 1983 action was permitted against a judge who had ordered the plaintiff incarcerated for contempt. The judge acted on the mistaken belief that there was a pre-existing contempt order pending against the plaintiff. The judge took it upon himself to have the plaintiff arrested and subjected to an immediate contempt hearing when, in the course of a casual conversation with the judge, the plaintiff refused to be sworn. In fact, the plaintiff had come to the courthouse only for the purpose of delivering a support payment to his ex-wife, an employee of another judge in the courthouse. The court in *Harper* found that the plaintiff did not visit the judge in his official capacity and thus, the judge's action did not meet the "judicial act" requirement for the application of absolute judicial immunity.

Conceding that the Defendant's use of the contempt power is a normal judicial function, the Plaintiff in the present cause would have this court find that her contacts with Judge McIlhany were, like those in *Harper*, outside of his judicial capacity. In weighing this proposed course of action, this court gives heed to the warning of the *Harper* court.

> But we caution that our holding is exceedingly narrow and is tailored to this, the rarest of factual settings. Succinctly stated, we hold only that when it is beyond reasonable dispute that a judge has acted out of personal motivation and has used his judicial office as an offensive weapon to vindicate personal objectives, *and* it further appears certain that no party has invoked the judicial machinery for any purpose at all, then the judge's actions do not amount to judicial acts (and) ... are not cloaked with judicial immunity from suit under § 1983. (*supra* at 859).

The present case does not seem to fit within the *Harper* Court's narrow application. As the Defendant's brief points out, Mrs. Adams letters were addressed to him

as a judge, she discussed the facts of cases then pending before him as judge, and she clearly knew she was dealing with him in his judicial capacity when she was summoned to appear before him in the October contempt proceeding. The reasonable conclusion to be drawn from these undisputed facts is that Doris Adams indeed "invoked the judicial machinery for (some) purpose", and that Judge McIlhany's actions were "judicial acts" which should be afforded the benefit of absolute judicial immunity.

■ The Plaintiff has called upon this court to delay deciding this motion until the Plaintiff can depose the Defendant "to determine on what basis the Defendant purportedly acted" and to discover how the Defendant's actions were characterized by the State Commission on Judicial Conduct.

However, the Court has determined that the controlling facts are not in dispute so that a delay in the rendition of its decision would serve no useful purpose. First of all, the characterization of Judge McIlhany's conduct by the State Commission on Judicial Conduct is not binding on this court nor is it in any way determinative of what constitutes a "judicial act" or what falls within Judge McIlhany's "jurisdiction". Furthermore, the Commission's proceedings are confidential, both constitutionally [Art. 5, § 1–a(10)] and legislatively [Art. 5966a, § 8A] until such time as the Commission decides to bring formal action against a judge. The Commission has not done so here.

■ As has already been noted, the Plaintiff also seeks additional time to discover upon what basis the judge acted. However, as previously stated, such considerations will not serve to defeat judicial immunity. As the Court in *Stump* pointed out, even if the judge had acted in error or maliciously, his immunity would remain intact so long as he did not act clearly outside his jurisdiction. This court has already determined that the judge did not act clearly outside his jurisdiction.

The *Harper* court suggests that motive is a consideration in defining judicial acts.

However, personal motivation is only one part of the conjunctive *Harper* test, the other being whether the party has "invoked the judicial machinery for any purpose at all." *Harper* at 859. Again, it is clear from the undisputed facts that the Plaintiff in this case invoked the judicial machinery in writing her letters to the judge. Therefore, the fact that Judge McIlhany arguably acted out of personal motivation is insufficient to remove his actions from the protected sphere of judicial acts.

*Section 1983 and Judicial Immunity.*

■ The question arises as to whether Section 1983 changes the statutes of the doctrine of judicial immunity. This question was answered definitively by the Supreme Court in the case of *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

> We do not believe that this settled principle of law was abolished by § 1983, which makes liable "every person" who under color of law deprives another person of his civil rights. The legislative record gives no clear indication that Congress meant to abolish wholesale all common law immunities.... The immunity of judges for acts within the judicial role is ... well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine. (*Id.* at 1218)

Thus, the "every person" referred to in § 1983 means "every person except judges." *Harper, supra* at 856.

Therefore, the Defendant may successfully claim the doctrine of absolute judicial immunity to the suit in damages under § 1983 despite the highly questionable nature of his actions.

> Disagreement with the action taken by the judge, however, does not justify depriving that judge of his immunity. Despite the unfairness to litigants that sometimes results, the doctrine of judicial immunity is thought to be in the best interests of the proper administration of justice. *Stump, supra* at 1108.

## JUDICIAL IMMUNITY TO EQUITABLE RELIEF

The Plaintiff in this cause also seeks injunctive and declaratory relief under § 1983 and cites the Court to *Pulliam v. Allen,* —— U.S. ——, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) in support thereof. In *Pulliam,* a case wherein the defendant-judge allegedly made a practice of jailing persons unable to make bond for nonjailable misdemeanors, the Court addresses for the first time whether a judge's absolute judicial immunity shelters him from prospective injunctive relief.

The *Pulliam* Court concluded that common law judicial immunity did not bar such relief. The Court states:

> nothing in the legislative history of § 1983 or in the Courts' subsequent interpretations supports a conclusion that Congress intended to insulate judges from prospective collateral injunctive relief. *Pulliam* at ——, 104 S.Ct. at 1980.

After reviewing the underlying purpose of enacting the § 1983 legislation, the court again declared:

> we remain steadfast in our conclusion that Congress intended § 1983 to be an independent protection for federal rights and find nothing to suggest that Congress intended to expand the common law doctrine of judicial immunity to insulate state judges completely from federal collateral review. *Id.* at ——, 104 S.Ct. at 1981.

Finally, the court states once again,

> We conclude that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity. *Id.* at ——, 104 S.Ct. at 1981.

As to the related subject of the award of attorney's fees in a § 1983 case pursuant to § 1988, the Court found that Congress intended that such awards be available "even when damages would be barred or limited by immunity doctrines or special defenses, available only to public officials." *Pulliam* at ——, 104 S.Ct. at 1982. Thus, judicial immunity does not bar the award of attorney's fees under § 1988 when prospec-tive relief is properly awarded in the enforcement of a § 1983 claim.

Nevertheless, it should be noted that the *Pulliam* Court did not consider whether the injunctive relief awarded in that case was appropriate since the issue was not before the court on appeal. However, the Court did briefly discuss the fact that there were limitations on the availability of equitable relief.

> The limitations already imposed by the requirements for obtaining equitable relief against any defendant—a showing of an inadequate remedy at law and of a serious risk of irreparable harm, severely curtail the risk that judges will be harassed and their independence compromised. *Pulliam* at ——, 104 S.Ct. at 1978.

In *Slavin v. Curry,* 574 F.2d 1256 (5th Cir.1978), the Fifth Circuit in consideration of a § 1983 action against a judge, noted that "courts will grant declaratory relief only if there is a substantial controversy of sufficient immediacy and reality between parties having adverse legal interests" and that determination depends upon the plaintiff's current condition. *Id.* at 1264.

Doris Adams has been released from confinement and is no longer under any apparent threat of immediate harm. In *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), the Supreme Court considered the standing of appellees, the context of the case or controversy requirement of Art. III, to seek injunctive relief in the District Court from imprisonment pursuant to an order of contempt. There the Court held that certain named appellees "having been released from jail, no longer had a live controversy ... as to either the contempt citation or the short periods of incarceration which would entitle them to injunctive relief." *Id.* at 1215-6. The reasoning of *Juidice* would be applicable in the present case, defeating the plaintiff's claim for equitable relief despite the lack of apparent legal remedies available to redress the wrongs done.

Another factor which weighs in favor of granting the Defendant's Motion to Dismiss as to the equitable relief sought by the Plaintiff, is the difficulty in this case of fashioning appropriate relief without infringing upon the proper exercise of the contempt power in the future. Whether a particular defendant has or has not committed contempt of court is a question normally and necessarily left to the discretion of the presiding judge. To place the State Court Judge under the watchful eye of the federal district court and the ever present threat of contempt might deter even the most courageous judge from exercising this discretion independently and free from intimidation.

The problem is more acute in the present case than under the *Pulliam* facts. Whereas the *Pulliam* Court was dealing with a routine and defined practice of the judge in question, here the Court is faced with allegations that a judge acted injudiciously under a particular set of facts. Under these circumstances, the requested equitable relief would require a vague and open-ended prohibition of the judge's acting to violate a contemnor's rights in the future under the threat of being held in contempt of this Court. To do so would greatly increase the potential for harassing litigation and the corresponding intimidation of the judge in performance of his judicial duties in the future, and therefore, is inappropriate at this time.

## CONCLUSION

In conclusion, the Defendant in this cause is judicially immune from a suit in damages under the facts of this case. Further, since the Plaintiff is no longer incarcerated nor under apparent threat of future harm, there is no longer a live controversy to which the application of equitable relief would be appropriate. There being no genuine issue of material fact, the Court finds that as a matter of law, the Defendant should be granted summary judgment.

It is so ORDERED.