**GRANT; and Opinion Filed June 19, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-17-01129-CV
_____

## IN RE PATRICK DAUGHERTY, Relator

**Original Proceeding from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 12-04005**

# MEMORANDUM OPINION

Before Justices Francis, Brown, and Whitehill
Opinion by Justice Brown

The underlying proceeding involves a contentious business dispute between relator Patrick Daugherty and his former employer, Highland Capital. Daugherty seeks a writ of habeas corpus vacating a criminal contempt order. This Court stayed the contempt order and requested a response to the petition. After reviewing the petition, Highland Capital's response, Daugherty's reply, and the record, we conclude Daugherty is entitled to the relief requested and we grant the writ of habeas corpus.

## Background

A permanent injunction was entered in 2014 that prohibits Daugherty from:

[R]etaining, using, disclosing, publishing or disseminating Highland's (or its affiliates') confidential, proprietary, and/or privileged information concerning Highland's customers, clients, marketing, business and operational methods, contracts, financial data, technical data, e-mail, pricing, management methods, finances, strategies, systems, research, plans, reports, recommendations and conclusions, tear sheets, industry comparative analysis, Collateralized Loan Obligation (CLO) and other structured products, and names, arrangements with, or

other information relating to Highland's (or its affiliates') customers, clients, suppliers, financiers, owners, and business prospects.[1]

On July 20, 2017, Highland filed a "Supplemental Motion to Show Cause" in which Highland sought to hold Daugherty in contempt for violating the permanent injunction. The allegations focused on Daugherty's engaging in three conversations with another former Highland Capital employee, Joshua Terry, about Highland Capital. In addition to being a former employee, Terry is a party to an ongoing arbitration proceeding involving the management of a Highland-affiliated fund, Acis Capital Management, L.P.

The trial court "found, beyond a reasonable doubt, that Daugherty violated the Permanent Injunction" on the following three occasions "during conversations with" Terry (1) "on July 4, 2016," (2) "during December 2016," and (3) "in February or March 2017." The trial court found that Daugherty had violated the permanent injunction during each of those conversations by doing the following:

> Daugherty used and/or disclosed information regarding Highland and/or its affiliates (including Highland Employee Retention Assets, LLC, NexBank Capital, Inc., and Acis Capital Management, L.P.), and the operational and tax strategies employed by such entities.

The trial court sentenced Daugherty to 38 days' confinement and a $1,500 fine "for using, disclosing, and disseminating Highland's and its affiliates' confidential, proprietary, and/or privileged information, as defined in the Permanent Injunction." The punishment was broken down as follows:

- $500 for each violation.

- Three days' confinement in the Dallas County jail for the July 4, 2016 communication with Terry.

- Two weeks' confinement (14 days) for the communications with Terry in December 2016.

---

[1] Daugherty is permitted to use or disclose the information described "only as (i) required by law; or (ii) directed and authorized by Highland."

- Three weeks' confinement (21 days) for the communications with Terry in February or March 2017.

**The Three Conversations with Terry**

Highland conceded at the August 28, 2017 contempt hearing that Highland sought the contempt order solely on the three conversations between Terry and Daugherty:

> While we do think that Mr. Daugherty violated the injunction with respect to the Wall Street Journal, that was not the basis of the supplemental show cause motion and that's not the basis we're here today. Actually I'll point out that Mr. York in his objection to the show cause order said, although factually incorrectly, that there was no notice of the communications between Daugherty and Terry, shows exactly that he knows what we're here for today. ***That is exactly what we're here for today is, Mr. Daugherty communicated with Josh Terry and did he violate the injunction in the course of those communications?***

(emphasis added). The trial court held Daugherty in contempt based on the three conversations with Terry. The following evidence was presented regarding each of the violations found by the trial court:

**1.    July 4, 2016 conversation with Terry**

Terry testified in his deposition that he "personally spoke with" Daugherty on July 4, 2016. Daugherty "brought up Highland" during the conversation, but Terry "can't remember the specifics." The conversation took place at a neighborhood 4th of July parade. Terry did not "really remember anything" from the July 4th conversation. Terry just knew that he "never divulged anything" to Daugherty about Terry's litigation dispute with Highland. Terry thinks Daugherty "inquired about" Terry's departure from Highland, but Terry could not "remember what he said specifically":

> Q: But had – had he asked you about it?

> A: I think he just – I'm sure he inquired about it, but I can't remember what he said specifically.

> Q: And this was – so he inquired generally about, hey, how's the disputes going with Highland, something to that effect?

A: No. I don't think – I don't think that.  I mean, that was – that was just a few weeks after I left, so it was probably something, like, I heard you left Highland or – I don't know.  But I don't think – I don't think he referred to it as – he may have, but I doubt it.

At the contempt hearing, Daugherty explained that he "would not call" the July 4th allegation a conversation because he simply saw Terry at the neighborhood parade, walked up to Terry, and asked Terry if Highland was "f'ing [him] yet." Daugherty testified that Terry replied that he couldn't talk about it and had nothing to say about it, and Daugherty told Terry "I get it" and that Daugherty was just trying to work his way through it. He then went back to be with his family for the parade. Daugherty also told the court he is not trying to violate the injunction and has not given Terry any Highland information.

**2.      December 2016 conversation with Terry**

Terry also testified in his deposition that he "personally spoke with" Daugherty in December 2016, Daugherty "brought up Highland" during the conversation, but Terry "can't remember the specifics." The conversation occurred in Terry and Daugherty's neighborhood and they did not discuss anything "specific to [Terry's] dispute with Highland." Terry did not remember if Daugherty reiterated an offer to cooperate and be a witness in Terry's dispute with Highland and did not think Daugherty asked him if he would be willing to testify in Daugherty's matters against Highland.

Daugherty also testified that the December 2016 conversation was not specific to Terry's dispute with Highland and that no confidential information was shared during the conversation, which occurred on the street a few houses down from Daugherty's house:

> A: . . . And while I'm getting my truck, Josh comes up in his Tesla, and he's like, hey, what's up? And I'm like, you're not going to believe what these A-holes are doing this time. There you go.
>
> Q. Is that the extent of your conversation?
>
> A. Yeah.

–4–

**3.     February or March 2017 conversation with Terry**

As with the July and December conversations, Terry testified in his deposition that he "personally spoke with" Daugherty in February or March 2017, Daugherty "brought up Highland" during the conversation, but Terry "can't remember the specifics." Like the December 2016 conversation, the February or March 2017 conversation occurred in Terry and Daugherty's neighborhood and they did not discuss anything "specific to [Terry's] dispute with Highland." Again, Terry did not remember if Daugherty reiterated an offer to cooperate and be a witness in Terry's dispute with Highland and did not think Daugherty asked him if he would be willing to testify in Daugherty's matters against Highland.

Daugherty's testimony about the February or March 2017 conversation was, again, consistent with Terry's recollection:

> The February/March 2017 was, I was on a walk with my wife. And I guess, yeah, Highland did come up. Oh, that's when I told Josh I'm going to be filing lawsuits against Highland Employee Retention Asset, Dondero, and Highland Capital itself for fraudulent conveyance of the assets out of the escrow account. And I think I was going to bring up other matters, I don't think I went into the details. I think I said I was going to pursue other matters, I don't think I got into the details.

### The June 22, 2016 Note to Terry

When Terry could not remember the topics or specifics of what was discussed during his three conversations with Daugherty, Highland argued to the trial court that a handwritten note Daugherty left at Terry's home on June 22, 2016 "gives more than adequate proof as to the topics discussed." That note states the following in its entirety:

> Dear Josh,
>
> I heard about your abrupt departure from Highland.  There are many who are taking pleasure in your demise.  I am <u>not</u> one of them. While I was disgusted with your misleading testimony during my trial and your false statements in the affidavit submitted to the court last summer. I do not want to see you or your family put through the same hell that was levied upon me and my family.  I have no doubt that the tax code and your indiscretions are being used against you to steal what is rightfully your's and your family's. You will find it difficult and lonely to pursue justice and truth.  Many will lie or "forget" in order to appease Dondero.  I offer

–5–

myself as a potential witness – willing to tell the truth about how things really operate at Highland under the leadership of Dondero and Okada. Please feel free to call at [phone number].

Stay strong and good luck. [Signature]

P.S. Find strength in your family and real friends.

(emphasis in original). Jim Dondero is a general partner of Highland Capital Management, LLP, and Mark Okada is one of the other partners.

At the punishment hearing, Highland's counsel conceded that Highland was not claiming the letter itself was a violation. Yet, Highland argues that various statements in the note either referenced Highland's confidential business strategies or showed Daugherty's intent to disclose such information. For example, Highland opined that Daugherty's statement that "I have no doubt that the tax code and your indiscretions are being used against you to steal what is rightfully your's [sic] and your family's" is a reference to investment strategies relating to tax implications implemented by Highland, and the trial court adopted that opinion as a finding in the contempt order. Similarly, according to Highland, Daugherty's reference to "the tax code" in the note "suggests that he has been in contact with Mr. Terry and/or his counsel regarding the allegations involved in the Terry Arbitration, and that he intends to discuss confidential information relating thereto," Terry's allegations in the Terry Arbitration relate to Highland's tax strategies, and such information "is inarguably subject to the Permanent Injunction." Highland presented nothing more than its speculation on these points, however.

Further, Highland maintains that Daugherty's offer to testify on Terry's behalf "and the subsequent conversations" with Terry "demonstrate Mr. Daugherty's continued contempt for this Court's Permanent Injunction." Highland argued that Daugherty's statement that he will tell "how things really operate at Highland under the leadership of Dondero and Okada" is a demonstration of "Daugherty's *intent to violate* the Permanent Injunction." (emphasis added).

–6–

Highland also opined that the note "laid out the topics Mr. Daugherty intended to discuss when he next met Mr. Terry" and the fact that Terry and Daugherty spoke on three occasions thereafter establishes that "Daugherty in fact followed up on his offer" and "indicates both that Mr. Daugherty has violated the Permanent Injunction in these conversations with Mr. Terry and that future violations are inevitable absent Court intervention." Highland also speculated that "past practice" of volunteering to appear in other litigation involving Highland and giving "outlandish testimony" suggests that Mr. Daugherty followed through with his offer to Mr. Terry and violated the permanent injunction during his conversations with Terry. Again, Highland presented nothing but its own speculation to support these arguments.

Terry and Daugherty denied Highland's allegations. And even Highland's witness, Isaac Leventon, conceded that, "other than the reference to the tax code in the handwritten note" he is not aware "of any other written document or e-mail" Daugherty sent to Terry "disclosing the tax strategies of Highland." Also, he was not aware of any conversation between Daugherty and Terry or Daugherty and third parties about Highland tax strategies.

### Standard of Review

This original habeas corpus proceeding is a collateral attack on a contempt judgment. *See Ex parte Rohleder*, 424 S.W.2d 891, 892 (Tex. 1967) (orig. proceeding). The purpose of a habeas corpus proceeding is not to determine the ultimate guilt or innocence of the relator, but only to ascertain whether the relator has been unlawfully confined. *Ex parte Gordon*, 584 S.W.2d 686, 688 (Tex. 1979) (orig. proceeding). In a habeas corpus proceeding, the order or judgment challenged is presumed to be valid. *Ex parte Occhipenti*, 796 S.W.2d 805, 809 (Tex. App.—Houston [1st Dist.] 1990, orig. proceeding). A relator bears the burden to show that the contempt order is void and not merely voidable. *In re Pruitt*, 6 S.W.3d 363, 364 (Tex. App.—Beaumont 1999, orig. proceeding). An appellate court may order the contemnor released only if the judgment

is void because of a lack of jurisdiction or because the contemnor was deprived of liberty without due process of law. *In re Lausch*, 177 S.W.3d 144, 150 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding); *In re Houston*, 92 S.W.3d 870, 875–76 (Tex. App.—Houston [14th Dist.] 2002, orig. proceeding).

### Applicable Law

There are two forms of contempt: civil and criminal. A criminal contempt order is punitive in nature and is an exertion of the court's inherent power to punish a party for "some completed act which affronted the dignity and authority of the court." *Ex parte Johns*, 807 S.W.2d 768, 771 (Tex. App.—Dallas 1991, orig. proceeding) (quoting *Ex parte Werblud*, 536 S.W.2d 542, 545 (Tex. 1976)). Criminal contempt orders generally require the individual to be incarcerated for a finite period and that period is unaffected by the individual's performance of any future act. *In re Scariati*, 988 S.W.2d 270, 272 n.1 (Tex. App.—Amarillo 1998, orig. proceeding); *Ex parte Hoskens*, 480 S.W.2d 18, 23 (Tex. Civ. App.—Beaumont 1972, orig. proceeding). In criminal contempt proceedings, the contemnor is being punished for his improper actions "and no subsequent voluntary compliance on the part of the defendant can enable him to avoid punishment for his past acts." *Ex parte Johns*, 807 S.W.2d at 771 (quoting *Ex parte Hoskens*, 480 S.W.2d at 23). A judge can impose a fine or imprisonment or both in a criminal contempt order. *Id.* The distinguishing feature of criminal contempt is that the penalty is unconditional. *Id.* The trial court's 38-day sentence and $1,500 fine is a criminal contempt order because it punishes relator for violating the permanent injunction. *See, e.g.*, *In re Scariati*, 988 S.W.2d at 272 n.1 (order was one for criminal contempt because relator was sentenced "to jail for six months for not maintaining health insurance for his children and the sentence was not subject to being reduced upon his obtaining such insurance").

**Due Process Requirements**

A criminal contempt conviction for violation of a court order requires proof beyond a reasonable doubt of: (1) a reasonably specific order; (2) a violation of the order; and (3) the willful intent to violate the order. *Ex parte Chambers*, 898 S.W.2d 257, 259 (Tex. 1995) (orig. proceeding). "Noncompliance with an unambiguous order of which one has notice will ordinarily raise an inference that the noncompliance was willful." *Id.* at 261. "The involuntary inability to comply with an order is a valid defense to criminal contempt, for one's noncompliance cannot have been willful if the failure to comply was involuntary." *Id.* The relator bears the burden of proving his inability to comply. *Ex parte Hayes*, No. 05-17-00473-CV, 2017 WL 2889047, at *3 (Tex. App.—Dallas July 7, 2017, orig. proceeding) (mem. op.) (citing *Ex parte Chambers*, 898 S.W.2d at 261). "In reviewing the record, we are without jurisdiction to weigh the proof and determine whether it preponderates for or against the relator; rather, we determine only if the judgment is void because, for example, the relator has been confined without a hearing or with no evidence of contempt to support his confinement." *Ex parte Chambers*, 898 S.W.2d at 259–60.

**Discussion**

Because the trial court's contempt order is criminal in nature, it must be supported by evidence establishing beyond a reasonable doubt that the permanent injunction is a reasonably specific order, Daugherty violated the permanent injunction, and Daugherty had the willful intent to violate the permanent injunction. Under this record, we conclude that the evidence did not establish beyond a reasonable doubt that Daugherty violated the permanent injunction and that the contempt order is, therefore, void.

The evidence is undisputed that Daugherty and Terry spoke to each other on July 4, 2016, in December 2016, and in February or March 2017, and Daugherty wrote a note to Terry on June 22, 2016. The record also shows that Daugherty mentioned Highland during those conversations.

But the record includes no evidence that Daugherty retained, used, disclosed, published, or disseminated Highland's or its affiliates' confidential, proprietary, and/or privileged information of any kind to Terry during those conversations. There is also no evidence that Daugherty used or disclosed "the operational and tax strategies employed by" Highland and its affiliates. During those conversations and in the note, Daugherty offered to testify for Terry against Highland should Terry require such testimony. But the record does not show that Daugherty gave Terry confidential, propriety, or privileged information that he intended to testify about. This record shows, at most, that Daugherty shared his negative feelings about Highland with Terry and told Terry that Highland would treat Terry unfairly as Daugherty feels Highland treated him. There is no evidence that Daugherty disclosed Highland's or its affiliates' operational and tax strategies, client information, or any information that could be considered confidential, proprietary, or privileged. On this record, there is no evidence to support the trial court's finding that Daugherty violated the permanent injunction beyond a reasonable doubt.

Highland maintains that Daugherty's past conduct and modus operandi included dispensing Highland's confidential information to third parties and showed a motive to take action that could harm Highland. According to Highland, that past conduct constitutes circumstantial evidence to show that Daugherty violated the permanent injunction and acted with willful intent. Although such circumstantial evidence may support a finding of willful intent, such evidence cannot establish an actual violation of the permanent injunction. That requires evidence showing the dissemination of protected information by Daugherty to Terry. Highland produced no such evidence. The trial court's determination that Daugherty disclosed confidential, proprietary, or privileged information to Terry during the three conversations is based on Highland's speculation and opinion that Daugherty must have disclosed information covered by the permanent injunction because Daugherty talked to Terry after sending the June 22, 2016 note. That speculation is

–10–

insufficient to establish that Daugherty actually engaged in conduct that violated the injunction. No evidence supports the trial court's findings of violations and, therefore, those findings cannot support the criminal contempt order.

We conclude that the contempt order is void because there is no evidence to support the trial court's findings that Daugherty violated the permanent injunction. Based on this conclusion, we need not address Daugherty's remaining arguments.

Accordingly, we grant the writ of habeas corpus and vacate the August 30, 2017 "Order Holding Patrick Daugherty in Criminal Contempt" and the September 25, 2017 "Judgment of Contempt and Order of Commitment" issued by the 68th Judicial District Court of Dallas County, Texas in cause number 12-04005 styled *Highland Capital Management L.P., et al. v. Patrick Daugherty v. Sierra Verde, LLC, et al.* We order that relator Patrick Daugherty be unconditionally released and discharged from the custody of the Sheriff of Dallas County under the September 25, 2017 "Judgment of Contempt and Order of Commitment." We further discharge any bond paid by relator in accordance with this Court's September 28, 2017 order.

/Ada Brown/
ADA BROWN
JUSTICE

171129F.P05

–11–